UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 13-1485(DSD/BRT)

United Sugars Corporation,

        Plaintiff,

v.                                                          **ORDER**

U.S. Sugar Co., Inc.,

        Defendant.


     David R. Crosby, Esq., Melanie A. Full, Esq. and Stinson
     Leonard Street, LLP, 150 South Fifth Street, Suite 2300,
     Minneapolis, MN 55402, counsel for plaintiff.

     Nicolas J. Rotsko, Esq. and Phillips Lytle LLP, 3400 HSBC
     Center, Buffalo, NY 14203 and Amy L. Schwartz. Esq., and
     Lapp, Libra, Thomson, Stoebner & Pusch, 120 South Sixth
     Street, Suite 2500, Minneapolis, MN 55402, counsel for
     defendant.


    This matter is before the court upon the motion for summary
judgment by plaintiff United Sugars Corporations (United). Based
on a review of the file, record, and proceedings herein, and for
the following reasons, the court grants the motion in part.


**BACKGROUND**

    This contract dispute arises out of the parties' fixed-price
contracts for the delivery of sugar between 2010 and 2013. United
is a cooperative owned by three sugar producers and refiners.
United sells sugar produced by its members to industrial and retail
customers in the United States. Defendant U.S. Sugar Co., Inc.

(U.S. Sugar) purchases sugar from suppliers such as United and then packages the sugar for retail sale under private store labels.

The contracts at issue are dated October 26, 2010, June 2, 2011, and June 8, 2012.  See Full Aff. Exs. D, F, G.  Each contract includes the quarterly delivery period, the amount of sugar, and the price per cwt.[1]  See id.  The 2010 contract provided that U.S. Sugar would purchase 30,000 cwt for each of the first two quarters of 2012 and 45,000 cwt for the two last quarters of 2012, all at a price of $43.70 per cwt.  See id. Ex. D, at 1.  The 2011 contract obligated U.S. Sugar to purchase an additional 100,000 cwt of sugar in the fourth quarter of 2012 at a price of $47.00 per cwt.  Id. Ex. F, at 1.  The 2012 contract obligated U.S. Sugar to purchase in 2013 63,000 cwt (first quarter), 69,000 cwt (second quarter), 78,000 cwt (third quarter), and 90,000 cwt (fourth quarter) at price of $42.35 per cwt.  Id. Ex. G, at 1.  It is undisputed that U.S. Sugar did not purchase any sugar in the fourth quarter of 2012 under the 2010 contract[2] or at any point in 2013.

U.S. Sugar CEO William McDaniel and United's Director of Sales, Gary Staples, have negotiated contracts between the parties since the mid-1990s.  McDaniel Dep. at 29:15-18.  McDaniel typically assessed the market to determine the desirable price and

---

[1]  Cwt is equivalent to 100 lbs.

[2]  U.S. Sugar did purchase 89,709 of the 100,000 cwt in the fourth quarter of 2012 under the 2011 contract.

timing for future contracts.  Id. at 29:21-30:2.  He then contacted Staples, usually by email, and negotiated the prices and dates for each contract.  See id. 33:9-17.  Contract execution was often a formality, and in some cases the contract - a standard form agreement between the parties - was not signed.  See, e.g., Full Aff. Ex. F.  Neither party disputes the formation of the contracts at issue.

As is the case with natural commodities, the sugar supply dictates its price.  When sugar is plentiful, its price declines; when the supply wanes, the price rises.  Sugar prices fluctuated considerably between 2007 and 2013.  See McDaniel Aff. Exs. A-C. For example, the price per cwt was $25.06 in 2007, $56.22 in 2011, and $27.44 in 2013.  See id. Ex. C.[3]  The contracts at issue, covering the 2012 and 2013 time period, contained fixed prices ranging from $42.35/cwt to $47.00/cwt.  Full Aff. Exs. D, F, G.  In April 2012, McDaniel told Staples that U.S. Sugar "bought too much sugar for this year north of $50" but acknowledged that U.S. Sugar's "United contracts are not the most harmful."  Id. Ex. U, at 1.  McDaniel then assured Staples that he intended to "honor all contracts" and that "[s]ometimes you just have to accept a loss in a commodity business."  Id. at 2.  Between April 2012 and June 8, 2012, the date of the last contract, McDaniel read reports

---

[3]  Historically, sugar prices have been less volatile than during this period.  See id.

indicating that conditions in 2012 could result in a bumper crop in 2013.  See McDaniel Dep. at 42:18-45:5, 56:1-14; Full Aff. Exs. X, Y, Z.  McDaniel nevertheless contracted with United for 300,000 cwt of sugar at $42.35/cwt.  Full Aff. Ex. G.  As noted, actual pricing in 2013 dropped to $27.44/cwt.  McDaniel Aff. Ex. C.  On January 14, 2013, McDaniel sent a letter to Staples explaining that U.S. Sugar's survival was in jeopardy given the "50% decline in bulk sugar prices over the past year, with most of that decline occurring since our contracts were signed."  Full Aff. Ex. EE. McDaniel then admitted that U.S. Sugar could not meet the terms of the contracts:

> The bottom line is that, although U.S. Sugar wishes to honor your contracts, we cannot take delivery on the 2012 carryover and the 2013 bookings on the schedule contemplated by the contracts.  We do not have the sales volume and retail sell prices to do so, and we cannot pay costs that create unsustainable losses.

Id.  He offered several possible alternatives to the existing contract terms including extending the performance period into 2014, purchasing additional sugar at a lower price to bring overall pricing closer to market prices, and forbearance on the 2012 carryover.  Id. at 2.  McDaniel estimated that U.S. Sugar could purchase all of the sugar under the contracts if the average delivered costs was $36.00/cwt.  Id.  Staples responded that United would be willing to agree to a blended price of $42.76 on all remaining amounts.  Id. Ex. FF.  McDaniel did not agree to the compromise.  Id.

On May 31, 2013, United filed suit in state court, and U.S. Sugar timely removed.  United brings claims for breach of contract and promissory estoppel.  On July 3, 2014, U.S. Sugar filed an amended answer, which includes counterclaims alleging breach of contract, misrepresentation, mistake, unjust enrichment, and overpayment and recoupment.  United now moves for summary judgment on its claims and U.S. Sugar's counterclaims.

## DISCUSSION

### I.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255.  The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial.  Celotex, 477

U.S. at 324.  A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A).  If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.  <u>Celotex</u>, 477 U.S. at 322-23.

## II.  United's Breach-of-Contract Claim

The parties do not dispute that U.S. Sugar failed to meet its obligations under the contracts.  Rather, the parties disagree as to whether (1) the contracts' force majeure clauses excuse U.S. Sugar's non-performance, and/or (2) the market conditions frustrated the contracts' purpose rendering them unenforceable. The "cardinal purpose of construing a contract is to give effect to the intention of the parties as expressed in the language they used in drafting the whole contract."  <u>Art Gobel, Inc. v. N. Suburban Agencies</u>, 567 N.W.2d 511, 515 (Minn. 1997).  Whether a contract is ambiguous is a legal question for a court to decide.  <u>Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.</u>, 279 N.W.2d 349, 354 (Minn. 1979).  A contract "is ambiguous if it is susceptible to more than one interpretation based on its language alone."  <u>Lamb Plumbing & Heating Co. v. Kraus-Anderson of Minneapolis, Inc.</u>, 296 N.W.2d 859, 862 (Minn. 1980).  Summary judgment is "inappropriate where terms of a contract are at issue and those terms are

6

ambiguous or uncertain." Bank Midwest, Minn., Iowa, N.A. v. Lipetzky, 674 N.W.2d 176, 179 (Minn. 2004).

### A. Force Majeure

"The effect of a force majeure clause is to excuse performance in the event an unforseen circumstance occurs." Melford Olsen Honey, Inc. v. Adee, 452 F.3d 956, 963 (8th Cir. 2006). "The performance to be excused is determined by the language of the clause." Id. Each contract at issue contains the same force majeure clause as follows:

> Neither party shall be in default hereunder by reason of any failure or delay in the performance of any obligation under this Agreement where such failure or delay arises out of any cause beyond the reasonable control and without the fault or negligence of such party. Such causes shall include, without limitation, storms, floods, adverse weather or other acts of nature negatively affecting sugar beet or sugar cane crops or sugar processing or refining facilities, ... governmental actions or regulations including sugar allotments, quotas, or allocations, and any adverse declaration or act by government agencies regarding the labeling, use or safety of sugar that would prevent or prohibit a party from, in whole or in part, ordering or furnishing sugar products or performing any other aspects of the obligations hereunder.

Full Aff. Exs. D ¶ 12, F ¶ 12, G ¶ 12.

According to United, the clause does not apply because it is only triggered in the event the sugar supply is negatively affected, which is contrary to what happened here. The court disagrees. The language "negatively affecting sugar beet or sugar cane crops" modifies the preceding clause listing so-called acts of God, i.e., storms, floods, and the like. A plain reading of the

provision as a whole establishes that the words "negatively affecting" do not modify subsequent language regarding governmental action, which is the clause at issue. As such, the governmental action clause must be scrutinized without regard to whether the sugar supply was "negatively affected."

U.S. Sugar argues that the governmental action clause applies here because it relied on the monthly World Agricultural Supply and Demand Estimate (WASDE) as published by the USDA in negotiating contract prices. McDaniel Aff. ¶ 8. The WASDE failed to anticipate, however, the price collapse in 2012 because it materially underestimated the domestic sugar supply. Rotsko Aff. Ex. H, at 7-8. Based on the faulty WASDE data, U.S. Sugar argues that the USDA increased the import quota by 450,000 tons in 2012, thereby allowing the market to be flooded with sugar later in 2012. Id. at 8. Even if true - and assuming a direct correlation between the inaccurate WASDE, the USDA's action, and the market price in 2012 - these facts do not trigger the force majeure clause. The relevant portion of the clause excuses non-performance when the governmental action "prevent[s] or prohibit[s] [U.S. Sugar] from ... ordering ... sugar products or performing" under the contracts.[4] Full Aff. Exs. D ¶ 12, F ¶ 12, G ¶ 12. At most, the

---

[4] U.S. Sugar ignores this portion of the governmental action clause by inserting a period after the word "allocation." See Def's. Opp'n Mem. at 25; see also id. at 17. In fact, the clause continues, expressly stating that only governmental action "that
(continued...)

governmental action here made U.S. Sugar's performance unprofitable, but did not prevent or prohibit its performance. Under these circumstances, the court cannot conclude that the force majeure clause applies.

Moreover, numerous courts have declined to apply a force majeure clause where governmental action affects the profitability of a contract, but does not preclude a party's performance. See, e.g., Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1293-94 (Fed. Cir. 2002) (declining to apply the force majeure clause because the risk that market price will make performance unprofitable is inherent in fixed-price contracts); In re Millers Cove Energy Co., 62 F.3d 155, 159 (6th Cir. 1995) (holding that "lack of economic feasibility" does not exclude contract performance under contract's force majeure clause absent specific language to that effect); Langham-Hill Petroleum, Inc. v. S. Fuels Co., 813 F.2d 1327, 1330 (4th Cir. 1987) (rejecting application of force majeure clause where foreign government acted to cause a collapse in world oil prices, making the contract unprofitable for one party); N. Ind. Pub. Serv. Co. v. Carbon Cnty. Coal Co., 799 F.2d 265, 274-76 (7th Cir. 1986) (holding that the government's denial of a party's request to pass increased coal prices along to

---

[4](...continued)
would prevent or prohibit a party from, in whole or in part, ordering or furnishing sugar products or performing any other aspects of the obligations hereunder" triggers the force majeure clause.  Full Aff. Exs. D ¶ 12, F ¶ 12, G ¶ 12.

its customers did not excuse that party from a long-term contract to buy coal even though performance created economic hardship); B.F. Goodrich Co. v. Vinyltech Corp., 711 F. Supp. 1513, 1519 (D. Ariz. 1989) (rejecting the argument that an unexpected drop in market price was within the scope of the contract's force majeure clause).  Indeed, a "force majeure clause is not intended to buffer a party against the normal risks of a [fixed-price] contract":

> The normal risk of a fixed-price contract is that the market price will change.... The whole purpose of a fixed-price contract is to allocate risk in this way.  A force majeure clause interpreted to excuse the buyer from the consequences of the risk he expressly assumed would nullify a central term of the contract.

N. Ind. Pub. Serv. Co., 799 F.2d at 275.  The contracts at issue do not expressly include market fluctuations as a basis for avoiding performance.  As a result, the force majeure clause does not excuse U.S. Sugar from performing.

**B.  Frustration of Purpose**

U.S. Sugar also argues that it need not perform under the contracts because the change in market conditions discharged the contract under the doctrine of frustration of purpose.  The doctrine of frustration of purpose, as adopted by Minnesota courts, is based upon the Restatement (Second) of Contracts § 265 (1981), which provides:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are

10

> discharged, unless the language or the circumstances
> indicate to the contrary.

Viking Supply v. Nat'l Cart Co., 310 F.3d 1092, 1096 (8th Cir. 2002).  The principal purpose "[m]ust be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense."  Id.  Here, U.S. Sugar's principal purpose was to buy sugar.  U.S. Sugar argues that this purpose was frustrated when the market collapsed and the contract prices far exceeded market prices.  The court disagrees.  The court cannot conclude that U.S. Sugar's purpose was frustrated; U.S. Sugar could have purchased sugar as promised under the contracts but chose not to do so.  Nor can the court conclude that a basic assumption of the contract was undermined by lower-than-expected market prices.  With fixed-price contracts, the parties understand that the contract price could be higher or lower than the market price at any given time.  See Full Aff. Exs. P, at 1, V, BB, at 1-2.  In other words, a basic assumption of the contract is market fluctuation.  As a result, summary judgment is warranted on United's breach-of-contract claim.  The court does not award United summary judgment on the issue of damages, however, because the court is unable to determine the appropriate measure or amount of damages based on the parties' submissions.

## III.  U.S. Sugar's Counterclaims

U.S. Sugar raised four counterclaims against United, all of which center on weight discrepancies between the sugar delivered by

United versus contract amounts.  ECF No. 31 ¶¶ 115-19, 122-27, 131-32, 135-37, 140-45.  U.S. Sugar seeks $645,914.77, plus interest, attorney's fees, and costs.  United argues that the counterclaims are barred under each contract's one-year statute of limitations. See Full Aff. Ex. D ¶ 10 ("No action, regardless of form, arising out of or alleging either a breach of any warranty or a breach of any contractual term or legal duty may be brought more than one year after the cause of action accrues.").  Although the Minnesota Uniform Commercial Code prescribes a four-year limitations period, it permits parties to "reduce the period of limitation to not less than one year."  Minn. Stat. § 336.2-725(1).  There is no dispute that U.S. Sugar discovered the weight discrepancies on or before December 26, 2012, which means that the limitations period expired on December 26, 2013.  U.S. Sugar did not bring its counterclaims until July 3, 2014.  ECF No. 31.

U.S. Sugar argues, however, that the limitations period is unenforceable because it is a non-negotiated provision that materially altered the contracts.[5]   See Minn. Stat. § 336.2-207(2)(b) (providing that additional contract terms will be deemed accepted unless they "materially alter" the terms of the offer). A term materially alters a contract if it would result in surprise

---

[5]  U.S. Sugar did not submit any of the contracts relevant to its counterclaims to the court.  Nor did U.S. Sugar reference specific contracts or other evidence in defending its counterclaims.

if incorporated without knowledge by the other party. Marvin
Lumber & Cedar Co. v. PPG Indus., Inc., 401 F.3d 901, 910-11 (8th
Cir. 2005) (quotation and citation and internal quotation marks
omitted). There is no evidence in the record that the limitations
period was not negotiated or that U.S. Sugar was unaware of its
inclusion in the parties' standard-form contract. Further, the
required element of surprise is lacking. The limitations period is
plainly set forth on page two of the parties' standard three-page
contract, which, apart from dates, amounts, and prices, is
identical in each contract submitted in evidence. See Full Aff.
Exs. D-G. U.S. Sugar argues that the limitations period language
is "hidden" in "small type." To the contrary, the limitations
period is included in the provision titled "LIMITATION OF LIABILITY
AND DAMAGE" and is in the same size font as the rest of the
contract. See id. ¶ 10. Even a cursory review of the contract
would have revealed the limitations period to the reader. Under
these circumstances, the court concludes that the limitations
period is enforceable.

U.S. Sugar also argues that its counterclaim for recoupment
survives even the one-year limitations period because it is based
on the same claims raised by United in its complaint. See
Household Fin. Corp. v. Pugh, 288 N.W.2d 701, 703 (Minn. 1980)
("[A] defense in the nature of recoupment is generally permitted
even though the applicable statute of limitations would have barred

13

an independent action on the same claim."). Given the dearth of evidence in support of this counterclaim, however, the court is unable to conclude that the recoupment claim is based on the same transactions at issue in United's breach-of-contract claim. Absent such a connection, there is no basis to allow the counterclaim to proceed. See id. at 705 n.7 ("As long as two claims arise from the same transaction and can be adjusted in the same proceeding, recoupment is available."). As a result, summary judgment is warranted on U.S. Sugar's counterclaims.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that the motion for summary judgment [ECF No. 39] is granted in part as set forth above.

Dated:  April 2, 2015

<div style="margin-left: 50%;">

s/David S. Doty
David S. Doty, Judge
United States District Court

</div>